# STATE OF NORTH CAROLINA

_____ Wayne _____ County

File No. 17 CVS 424

In The General Court Of Justice
☐ District  ☒ Superior Court Division

| Name Of Plaintiff |
| --- |
| Olivia Neal |

| Address |
| --- |
| c/o Glenn A. Barfield, PO Drawer 7, |

| City, State, Zip | | |
| --- | --- | --- |
| Goldsboro, | NC | 27533-0007 |

**VERSUS**

| Name Of Defendant(s) |
| --- |
| The University of North Carolina, and East Carolina University |

## CIVIL SUMMONS
☐ ALIAS AND PLURIES SUMMONS (ASSESS FEE)

G.S. 1A-1, Rules 3 and 4

| Date Original Summons Issued |
| --- |

| Date(s) Subsequent Summons(es) Issued |
| --- |

### To Each Of The Defendant(s) Named Below:

| Name And Address Of Defendant 1 | Name And Address Of Defendant 2 |
| --- | --- |
| The University of North Carolina | East Carolina University |
| c/o Thomas C. Shanahan, Sen. VP and Gen. Counsel/Process Agent | c/o Donna G. Payne, Univ. Counsel/Process Agent |
| 910 Raleigh Road | 215 Spilman Bldg., East 5th Street |
| Chapel Hill, NC 27514 | Greenville, NC 27858-4353 |

### A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff) | Date Issued 3-14-17 | Time 4:13 ☐ AM ☒ PM |
| --- | --- | --- |
| Glenn A. Barfield | | |
| Haithcock, Barfield, Hulse & Kinsey, PLLC | Signature _Donna McCary_ | |
| PO Drawer 7, 231 E. Walnut Street | | |
| Goldsboro, NC 27533-0007 | ☒ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court | |

| ☐ ENDORSEMENT (ASSESS FEE) | Date Of Endorsement | Time ☐ AM ☐ PM |
| --- | --- | --- |
| This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | Signature | |
| | ☐ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** _Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed._

(Over)

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|
| | | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

> *Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|
| | | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

> *Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid $ | Signature Of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name Of Sheriff (type or print) |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 6/16
© 2016 Administrative Office of the Courts

STATE OF NORTH CAROLINA

WAYNE COUNTY

FILED

2017 MAR 14 P 4: 13

WAYNE CO., C.S.C.

BY_____

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. 17 CVS 424

OLIVIA NEAL,

       *Plaintiff,*

v.

THE UNIVERSITY OF NORTH
CAROLINA and EAST CAROLINA
UNIVERSITY,

       *Defendants.*

)
)
)
)
)
)
)
)
)
)
)
)

**VERIFIED COMPLAINT**

NOW COMES the Plaintiff Olivia Neal, complaining of the Defendants, and the Plaintiff says and alleges as follows:

## PARTIES

1.    Plaintiff Olivia Neal is an individual citizen and resident of Wayne County, North Carolina, presently domiciled in both North Carolina and California. She is a qualified individual with a disability under 42 U.S.C. § 12131(2).

2.    Defendant University of North Carolina ("UNC") is a body politic and corporate capable of being sued pursuant to N.C.G.S. §116-3 for the actions of its constituent institutions. UNC is based in Orange County, North Carolina. It is a "public entity" under 42 U.S.C. § 12131(1) and, on information and belief, is a program or activity that receives federal funding as defined at 29 U.S.C. §794(b)(2)(A).

3.  Defendant East Carolina University ("ECU") is a public university, is a constituent institution of the University of North Carolina under N.C.G.S. §116-4, and is a body corporate capable of being sued under N.C.G.S. §116-3. ECU's main campus is in Pitt County, North Carolina. It is a "public entity" under 42 U.S.C. § 12131(1) and, on information and belief, is a program or activity that receives federal funding as defined at 29 U.S.C. §794(b)(2)(A).

## JURISDICTION

4.  Plaintiff brings this action pursuant to (a) Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 and §12203, as amended by the 2008 Americans with Disabilities Act Amendment Act (ADAAA), (b) the Rehabilitation Act, 29 U.S.C. § 794 and §704(a), and (c) the common law of North Carolina. The Superior Court has jurisdiction pursuant to N.C.G.S. § § 7A-240, *et seq.* and under these applicable federal statutes and the case law. The Plaintiff seeks damages in excess of $25,000 and injunctive relief.

## INTRODUCTION

5.  Plaintiff graduated in 2011 from the University of North Carolina – Chapel Hill with a bachelor's degree in Psychology.

6.  Plaintiff chose to pursue a career in social work.

7.  ECU presently and during all times stated or referenced in this complaint operated a School of Social Work (the SOSW) which offered a course and program of study (the MSW Program) leading to the award of a master's degree in the field of Social Work (the MSW degree).

8.　The MSW degree has intrinsic monetary value; as with any advanced graduate level degree, the holder of the MSW has greater employment opportunities, and is likely to be more highly compensated in employment throughout life, than those with only an undergraduate degree. Moreover, the MSW is a professional degree, and similar to degrees in law or medicine, is both a prerequisite for and an entrée into certain highly compensated professional occupations.

9.　Plaintiff applied to and was accepted by the SOSW for admission to the MSW Program beginning in the 2012 Fall Term at ECU's main campus in Greenville, North Carolina.

10.　For each semester of her enrollment in the SOSW, including without limitation the 2015 Spring Term, Plaintiff paid substantial monies to ECU for required tuition and fees.

11.　In exchange for the payment of such monies, ECU promised to provide Plaintiff with facilities, instructors, services and the opportunity to take advantage of these to complete the requirements of the MSW degree; ECU ultimately promised to confer the MSW degree upon Plaintiff if she satisfied those requirements.

12.　By the beginning of the 2015 Spring term, Plaintiff had paid tuition for and successfully completed almost all of the requirements for the award of the MSW degree; she had completed 51 of the required 60 credit hours of study and field internships during which she received 14 grades of "A" and only one "B", compiling a grade point average of 3.941 on a 4.0 grading scale.

13. In order to complete the MSW degree requirements, graduate, and be awarded the MSW degree, Plaintiff needed to take and pass two additional courses: SOSW 6550 Integrative Seminar (for three credit hours), and SOSW 6960 Field Instruction III (for six credit hours).

14. Plaintiff enrolled in and was admitted to the SOSW 2015 Spring Term to take SOSW 6550 and 6960.

15. Plaintiff paid the required tuition and other fees for the Spring Term to ECU.

16. Plaintiff began her Spring 2015 course and field work in January.

17. On or about March 17, 2015, Plaintiff was terminated from the MSW Program by the decision of a faculty Academic and Retention Committee. She was two months away from graduating and being awarded the MSW Degree.

18. This termination, the reasons therefore, and the Defendants' handling and determination of Plaintiff's appeal of the termination, form the underlying basis of this action.

### THE MSW FIELD PROGRAM

19. The MSW Program includes both classroom instruction and "field instruction". Field instruction involves placement of the student in a clinical environment at an outside agency where the student participates directly in the provision of social services to clients under the supervision of a "field instructor" who is a degreed MSW and who may or may not be employed by the agency, and under the direction of a Task Supervisor who provides day to day supervision.

20. An ECU SOSW professor is also assigned to meet with the student weekly to review and monitor the student's field work; this person is also designated a "field instructor".

21. During field placements, the MSW candidate is evaluated comprehensively, including evaluations of professionalism and ethical practice.

22. Nancy Pierson, LCSW, is now retired. During the Fall 2014 and Spring 2015 Terms Professor Pierson was the Director of Field Education for the SOSW and she was Plaintiff's clinical supervisor while Plaintiff did her internship at the House of Fordham.

23. During the 2014 Fall Term and the 2015 Spring Term Dr. Kerry Littlewood, PhD, MSW was the assistant director of the SOSW and the coordinator of the MSW Program at ECU.

24. Dr. Lena Carawan, PhD, taught Plaintiff's SOCW 6960-Field education II seminar during the Spring 2015 Term.

25. Dr. Intae Yoon, PhD, taught Plaintiff's SOSW 6550 Integrative Seminar during the Spring 2015 Term.

26. During the 2014 Fall and the 2015 Spring Terms Professor Paige Averette was Plaintiff's Faculty advisor.

27. During the 2014 Fall and the 2015 Spring Terms Dr. Sheila Bunch was the Director of the MSW Program.

28. During the 2014 Fall Term Professor Michael Robinson was one of Plaintiff's professors.

## PLAINTIFF'S MENTAL HEALTH CONDITIONS.

29.   When Plaintiff applied to the SOSW MSW Program, she disclosed to ECU that she had an existing diagnosis of Attention Deficit/Hyperactivity Disorder (ADHD).

30.   ADHD is a mental disorder involving a persistent pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning.

31.   Among its symptoms, as suffered by Plaintiff, are distraction, impulsiveness, inattention and difficulties with maintaining task orientation.

32.   Plaintiff's condition was however generally controlled by medication, and she did not need or request any accommodation from the SOSW upon her enrollment in 2012.

33.   During the fall of 2014 Plaintiff began to experience episodes of mild mania.

34.   In February 2015 Plaintiff experienced several episodes of more severe mania.

35.   In March 2015, after a brief hospitalization following a more severe episode, Plaintiff was diagnosed with bi-polar disease.

36.   Bipolar disease is characterized by a number of symptoms, including these suffered by Plaintiff:

   a.   Inflated self-esteem or grandiosity

   b.   Decreased need for sleep (e.g. feels rested after only three hours of sleep)

   c.   More talkative than usual or pressure to keep talking

d.   Flight of ideas or subjective experience that thoughts are racing

e.   Distractibility (i.e., attention too easily drawn to unimportant or irrelevant external stimuli)

f.   Increase in goal-directed activity (either socially, at work or school, or sexually) or psychomotor agitation

37.   Bipolar disease is a mental impairment that substantially limits many major life activities, including in plaintiff's case learning, reading, concentrating, thinking, and communicating.

38.   However, bipolar disease can be controlled by medication. After Plaintiff was diagnosed with bipolar disease, she was prescribed medication which largely controlled the symptoms of her bi-polar disease.

## THE 2014 FALL TERM

39.   The SOSW Faculty began to regard Plaintiff as suffering from a mental disability at least as early as the Fall 2014 term.

40.   During the Fall 2014 Term Plaintiff was enrolled and taking courses in the SOSW.

41.   During September 2014, Plaintiff began suffering from some episodes of mild mania.

42.   Plaintiff's mental state and associated behaviors were noticed by the MSW Program Faculty.

43.   On September 15, 2014, Professional Robinson wrote by email to Dr. Bunch and Dr. Littlewood to express concerns regarding Olivia's mental health and what Professor Robinson described as Olivia's "erratic behavior". He indicated that the concerns were more

about her mental health than her level of participation. His concerns were passed on the other members of the SOSW faculty.

44. Plaintiff was at this time successfully meeting all academic and field clinical requirements of the courses she was taking in the 2014 Fall Term.

45. Plaintiff's faculty adviser responded indicating that in recent conversations with Plaintiff her expression was "often very disorganized and hard to follow."

46. On or about September 19, 2014, Professor Pierson suggested that the faculty should convene an "Admission and Retention Committee" ("A&R Committee") meeting but stated "We'd need behavioral evidence to take any action."

47. An A&R Committee can be convened to address concerns regarding both academic concerns regarding a student's performance, and "non-academic competencies". An A&R Meeting addresses whether the student in question is to be retained in the program.

48. On September 23, 2014, Dr. Littlewood wrote to all of Olivia's professors asking them to "Please prepare a list of specific behaviors and an updated academic performance assessment to share with us so we can use your information to inform our decision . . ." – that decision being whether to retain Olivia in the MSW program.

49. None of the Plaintiff's professors responded expressing any significant concern or deficiency in Plaintiff's academic performance. None responded indicating any concern or deficiency in her field clinical work, other than to speculate whether she was performing in the field, given her mental health status.

50. In various emails professors expressed some concerns with Plaintiff 's non-academic behaviors, including distractive and impulsive activities, and strange personal expressions and communications.

51. An A&R Committee met on or about October 6, 2014 and determined that while Plaintiff exhibited signs of mental health issues, the behaviors reported did not impact professional requirements or impair Plaintiff from continuing in the MSW the MSW Program, and Plaintiff was retained in the program.

52. The members of the A&R Committee suggested that Plaintiff be referred to "ECU Cares", a university service offering counseling for mental health issues.

53. On October 28, 2014, Dr. Pierson wrote to Dr. Carawan indicating her belief that Plaintiff was suffering from a mental health condition, "such as ADHD, learning disability or right brain dominance".

54. Notwithstanding the faculty's expression of concern for Olivia's mental health, and Dr. Littlewood's directive that the faculty be on the lookout for behavioral or academic reasons to seek her dismissal from the MSW Program, Olivia completed the Fall 2014 Term, making straight As in her three courses, including Field Instruction II.

55. Plaintiff's grade in Field Instruction II was based in part on her completion of a Learning Agreement and Evaluation.

56. The Learning Agreement described various "competencies" as both learning and practice behaviors.

57. Among these was Competency 2.1.1 "Identify as a professional social worker & conduct oneself accordingly". Another was competency 2.1.2 "Apply social work ethical principles to guide professional practice."

58. Plaintiff completed her Learning and Evaluation Agreement, and was evaluated in her work by among others, Pierson. For each "competency" set forth in the agreement, the student is graded on a scale of one to five, with five being the highest. Plaintiff earned all fours and fives.

59. It was clear however by the end of the 2014 Fall Term that a number of the MSW Program Faculty, including Robinson, Littlewood, Carawan, Averette, Bunch, and Pierson, perceived Plaintiff to be suffering from a mental impairment, and in connection with this perception they had sought other grounds to dismiss Plaintiff from the MSW Program.

## THE 2015 SPRING TERM.

60. As noted above, prior to beginning the 2015 Spring term, Plaintiff had nearly completed all of the requirements to be conferred the MSW Degree. She had successfully completed two terms of field placement, for which she made grades of "A". She needed only to complete SOSW 6550 and SOSW 6960.

61. Plaintiff's Professor for SOSW 6550 was Dr. Intae Yoon. This was a classroom instruction course. This class was scheduled to meet only once a week, on Tuesdays.

62. SOSW 6960 consisted of a seminar led by Defendant Dr. Lena Carawan, and a clinical field placement. Dr. Carawan's seminar also met only once a week, also on Tuesdays. Thus,

Plaintiff was only required to attend class on campus one day a week during the 2015 Spring term.

63. Dr. Carawan was assigned as Plaintiff's Faculty Field Liaison for her field placement and the seminar she led consisted of discussions and presentations regarding its participants' field placements.

64. Plaintiff's 2015 Spring term field placement was with a homeless shelter in Goldsboro, North Carolina, the "House of Fordham".

65. In connection with this field placement, Plaintiff was required to create and have approved another "Learning Agreement and Evaluation", based on the same "competencies" and practice behaviors described in the prior Learning Agreement.

66. The SOSW assigned Defendant Professor Nancy Pierson as the "field instructor" who would provide the weekly field supervision for Plaintiff's placement with the House of Fordham. Ms. Pierson was to observe and evaluate her work there periodically.

67. Plaintiff worked under the direct supervision of her assigned Task Supervisor, Lynne Tyndall, also a LCSW, and Linda Burroughs, the Director of the House of Fordham.

68. On February 10, 2015 while interacting with Dr. Yoon, Plaintiff was experiencing some degree of mania, and her communications were disassociative and garrulous. The interaction was witnessed by Professor Pierson.

69. On that date Dr. Littlewood wrote to Dr. Bunch indicating that "Olivia has been talking with many faculty and field staff in our wing and appears to be having an episode."

70. On February 17, 2015, a number of the faculty communicated among themselves regarding their concerns about Olivia's mental health, including Dr. Yoon, Dr. Littlewood, Professor Carawan, Professor Pierson and Professor Averett, with Dr. Averett sharing the following "it was obvious last week Olivia was quite manic".

71. On February 18, 2015, Professor Pierson wrote to Professor Averett "[Plaintiff] started off the semester well but if she continues like last week, I can't imagine she'll successfully finish her assignments in field or in a graded seminar. . . . we can refer her to ECU CARES or do another A&R to address her academic performance."

72. On February 18, 2015, Dr. Littlewood responded to these expressions of concern about Olivia's mental health in an email to Olivia's professors, and to other faculty, stating that it might be a violation of FERPA for the faculty to be discussing Olivia's mental health and medication in relation to her performance in the MSW program. Dr. Littlewood went on to state "I recommend holding her to the same standards as other students . . . please document this as academic issues. They are the issues which we can hold the student accountable and pursue corrective action."

73. Dr. Littlewood's email ended with an important query to each of Olivia's professors: Did any of them have any concern about Olivia passing their respective classes based on her academic performance? Both of the professors responded that as of that time Olivia was on track to pass their classes and thus on track to graduate at the end of the Spring 2015 Semester with her Master's Degree in Social Work.

74. Later on February 18, 2015 Dr. Carawan wrote to Dr. Yoon, copying the rest of the faculty group, praising Olivia's academic work but stating that Plaintiff had a mental illness and

noting "I know that we have to consider Olivia, the clients she sees and will see, our school, and the university and last but not least the MSW Degree".

75. Again on February 18th Dr. Yoon wrote to the group noting that Olivia would likely pass his course but stating "She may be unaware of her own conditions" and responding to Dr. Carawan's apparent suggestion that the faculty should consider taking action "to stop her from graduating in May." While Dr. Yoon stated that he, at least, did not mean that they should prevent Plaintiff from graduating in May, he commented that they had to consider their "gatekeeping function".

76. Again on February 18, 2015, Professor Pierson wrote to the rest of the faculty group, noting that Olivia had done a good job so far that semester in the field and "has been on track except for last Tuesday." ". . . I would like to give her a chance to succeed if she can, but at the same time if she can't sustain it, we cannot pretend that she is functioning okay."

77. The final email February 18th was from Dr. Littlewood to the faculty group suggesting that all should be "on watch over the next week" and "exchange email about our concerns (including all academic, wellbeing, inappropriate behavior)."

78. Yet at this point no information had ever been received by or presented to the SOSW faculty suggesting that Plaintiff's delivery of services in the field had been in any way deficient or unprofessional. Nor had any information been received or presented indicating any academic deficiency in any of Plaintiff's work.

79. Instead, while the faculty focused on Plaintiff's mental status, Plaintiff continued to successfully do her class work and her field work, although she was experiencing agitation and other manic symptoms.

80. On February 26, 2015 Plaintiff was involved in an automobile accident, at which time she was found to be in a manic state. Plaintiff was then admitted to Holly Hill mental hospital in Raleigh, North Carolina. While in Holly Hill, Plaintiff was first diagnosed with Manic Depressive and/or Bipolar Disorder.

81. While in Holly Hill, Plaintiff was not allowed to communicate with persons on the outside, including the faculty at ECU School of Social Work. Plaintiff was released from Holly Hill on March 13, 2015.

82. Despite her hospitalization, during the period February 17 – March 17, 2015, Plaintiff missed only one session of each of her two classes, because other sessions during the period were canceled because of snow, not held because of Spring Break, or were cancelled by the professors teaching the classes.

83. The SOSW faculty continued to communicate amongst themselves speculating about Plaintiff's mental health.

84. Some of the faculty were apparently unaware that Plaintiff was unable to contact them, and unable to access her university email, because of her inpatient status at Holly Hill. Yet Dr. Bunche and Dr. Littlewood had been informed by March 3, 2015 that Plaintiff was hospitalized.

85. 2015 Spring Break for ECU was March 3-10.

86. During this week the SOSW faculty continued to speculate on what they perceived as Plaintiff's voluntary failure to respond to communications.

87. There was no policy regarding when or with what degree of alacrity students were to respond to communications from faculty.

88. Plaintiff had been diligent in communicating with her professors until she was hospitalized February 25, 2015 and unable to communicate.

89. It was not customary for students and faculty to communicate during Spring Break.

90. Indeed, the only reason some members of the faculty attempted to communicate with Plaintiff was to gauge her mental health.

91. The faculty, led by Dr. Bunch and Dr. Littlewood, decided during Spring Break to conduct an A&R meeting, and on the Friday of that week, March 13, 2015 Dr. Littlewood sent a notice to Plaintiff's university email that Plaintiff's attendance was required at the A&R Committee meeting at 9 am, Monday March 16, 2015.

92. Following her discharge from Holly Hill on March 13, 2015, Plaintiff was unable to access her university email until the evening of March 16, 2015 when she saw the meeting notice. Plaintiff immediately reminded Dr. Littlewood that she had been in the hospital and requested that the A&R meeting be rescheduled to the following afternoon, Tuesday March 17, 2015.

93. Plaintiff also reached out to Dr. Carawan and Professor Pierson to let them know she had been hospitalized and inquiring about the class schedule for the next day and catching up the one field supervision that had been missed.

94. That field supervision had been missed because Professor Pierson was unable to travel to Goldsboro due to bad weather.

## PLAINTIFF'S INTIAL TERMINATION

95. In response to Plaintiff's request, Dr. Littlewood forbade Plaintiff from attending her scheduled classes with Dr. Yoon and Dr. Carawan on March 17, 2015 and set a meeting at 3 pm on March 17, 2015 "to discuss the recommendation from this morning's Admission and Retention Meeting".

96. When Plaintiff met with Littlewood and Pierson On March 17, 2015, she provided a letter from her psychiatrist stating that he had reviewed her case and supported her return to normal school activities. Neither Dr. Littlewood nor Professor Pierson requested any additional information or documents regarding Plaintiff's ability to continue meeting the requirements of the MSW Program or provide clinical services in her field assignment.

97. Instead, they handed Plaintiff a written notice of her termination from the MSW Program. The notice was authored by Dr. Littlewood.

98. In the notice, Dr. Littlewood recited that Plaintiff was "notified of the meeting … but you failed to attend." It was dated March 17, 2015, after Dr. Littlewood had been informed that Plaintiff had been hospitalized and did not receive the notice until after the time set for the meeting had passed.

99. The notice recited that Plaintiff was "failing to demonstrate the academic and non-academic competencies that are required of [an] MSW candidate", and "failed to meet the standards and competencies required to perform as an ethical, professional, and knowlegable social worker".

100. However, Plaintiff was passing both of her classes, and as noted hereafter, did in fact pass the one class she was later allowed to complete, with a grade of "B". Moreover, Plaintiff's work in the field, including her performance on professional and ethical metrics, had been outstanding; as noted hereafter, Plaintiff completed her field assignment, and her Learning Agreement, and when graded on those specific competencies, scored "5" (the highest score possible) on each.

101. The notice cited the faculty's belief that Plaintiff was suffering from impaired functioning and its belief that Plaintiff's "mental health difficulties" would inevitably result in both her failure of the field course and the impairment of her professional judgment, and that Professor Pierson was now refusing to serve as Plaintiff's field instructor because of her impression of Plaintiff's mental impairment.

102. However, the A&R Committee never heard any evidence suggesting either academic failure or field work impairment was actually likely to occur; to the contrary Dr. Carawan and Dr. Yoon had indicated that Plaintiff would likely pass their respective classes, and had inquiry have been made to Lynne Tyndall or Linda Burroughs regarding Plaintiff's actual work in the field, the response would have been that her work was professional and exemplary.The notice also alleged Plaintiff's failure to be responsive to communications from the faculty during the period between February 10 and March 16, 2015; however, this allegation was

simply false as it related to the periods between February 10 and February 25, during which Plaintiff was in fact responding to and initiating communications with the faculty regarding schoolwork, supervision of her field work and scheduling matters, and March 3 and March 16, 2015, when ECU was on Spring Break. Plaintiff had only been out of normal communications with her instructors for approximately one week, during which time she was in patient at Holly Hill.

103. The Notice also recited the faculty's perception of "problems" Plaintiff had had in the Fall of 2014, but failed to acknowledge that these occasional inapt behaviors, which the faculty had attributed to mental illness even before Plaintiff was diagnosed with bi-polar disease, had not adversely affected either her academic or field clinical work – all of which had been graded "A" at the end of the 2014 Fall Term.

104. Finally the notice recited instances of tardiness in assignments and attendance, but failed to acknowledge that other students with similar records – but who did not suffer from mental illness – were not terminated for such shortcomings.

105. Taken together, the February 2015 emails among the faculty and the content of the notice of termination made it clear that the real reason that the SOSW faculty, and in particular Dr. Littlewood and Professor Pierson, decided to terminate Plaintiff from the MSW Program was their belief that Plaintiff was affected by mental illness, and their unjusfied belief that someone with such mental illness, even though sypmtoms could be controlled by medication, should not be allowed to perform the work of a professional social worker.

106. On March 25, 2017 Plaintiff presented another letter from Dr. McAllister, explaining (a) Plaintiff's specific diagnosis of bipolar disease, (b) that her ADHD medications may have

contributed to her episodes of mania, (c) that treatment had brought her symptoms under control, (d) she was no longer manic, and (e) she was able to continue her coursework at ECU.

107. However, the SOSW faculty refused to reconsider its decision, despite being presented evidence demonstrating that Plaintiff could successfully complete her course work, and that her condition was treatable and would not impair her professional judgment in the field.

## PLAINTIFF COMPLETES THE REQUIREMENTS FOR THE MSW DEGREE

108. Plaintiff appealed this decision pursuant to the applicable ECU Graduate School Appeal Policy. The applicable appeal policy provided that "no adverse recommendation or action" which was appealed would be effective until the appeal was finally concluded.

109. Plaintiff was initially barred from attending her classes, but invoked this provision of the appeal policy in seeking to continue in the MSW Program pending the determination of the appeal. Dr. Yoon agreed that Plaintiff could continue in his class, SOSW 6550, and Plaintiff thereafter completed that class and earned a passing grade of "B".

110. However, despite the tolling provision in the appeal policy, Professor Pierson refused to continue to serve as Plaintiff's SOSW Field instructor, and Dr. Carawan refused to allow the Plaintiff to attend her seminar class.

111. Professor Pierson notified the House of Fordham and Ms. Tyndall that Plaintiff had been terminated from the MSW Program, but did not suggest to Ms. Tyndall, nor to Ms. Burroughs, that Plaintiff should not be allowed to continue providing services to the clients

at the House of Fordham. Instead she indicated to Ms. Burroughs that Plaintiff's further provision of services was as a volunteer instead of as an ECU intern.

112. Ms. Denise Bernard, LCSW, then agreed to serve in the dual role of providing field supervision and field instruction for the remainder of Plaintiff's placement at the House of Fordham.

113. While her appeal was pending Plaintiff caught up all of her field hours, timely completed all of her field placement internship hours and duties, and timely completed and turned in all of her assignments to Dr. Carawan.

114. Dr. Carawan refused to grade Plaintiff's work. On information and belief Plaintiff earned and would have received a passing grade if Dr. Carawan had allowed her to attend the seminar and had graded her work.

115. Plaintiff completed her Learning and Evaluation Agreement, and was evaluated in her work by LCSWs Bernard and Tyndall. For the two competencies Professor Pierson believed Plaintiff could not meet because of her mental impairment (professional conduct and ethical practice), Plaintiff was rated a "5", again the highest grade possible.

116. Nonetheless, Plaintiff was not allowed to graduate, and was denied the MSW Degree she had earned.

## DENIAL OF PLAINTIFF'S APPEAL

117. In June 2015, a Review Panel recommended that Plaintiff's appeal be denied and that her termination from the MSW Program be upheld.

118. The Review Panel based its decision on its finding that Plaintiff had exhibited "erratic and unprofessional behavior on February 10, 2015" (the date of her manic verbal interaction with Dr. Yoon), and "inconsistent communication" with the SOSW faculty and supervisors.

119. The Review Panel refused to consider Plaintiff's diagnosis, her psychiatrist's opinion that the February 10 incident had been an isolated manifestation of her mental illness, or the psychiatrist's opinion that the illness was controlled by March 16, 2015. The Review Panel specifically refused to consider the fact that Plaintiff actually successfully completed Dr. Yoon's class, successfully completed her field placement, would have passed Dr. Carawan's class had she been graded for her work in it, and had never been shown to have acted unprofessionally in her field work.

## CLAIM I: DISABILTY DISCRIMINATION – 42 U.S.C. § 12132

120. All prior allegations set forth above are hereby incorporated by reference.

121. At all times referenced in the complaint Plaintiff was a qualified person with a disability under Title II the Americans with Disabilities Act, in that:

   a. she has ADHD and bipolar disease, which are mental impairments, and which separately and together substantially limit or impair, without limitation, concentrating, thinking, communicating, and interacting with others;

   b. she has a record of and it was known to the SOSW that she has these impairments;

   c. at the times that the SOSW (i) considered convening the Spring 2015 A&R Meeting; (ii) decided to convene such meeting: (iii) held such meeting; (iv) the

Committee recommended and imposed termination of Plaintiff from the MSW Program; (v) the SOSW refused to reconsider the decision even after receiving the March 16 and March 25, 2015 letters from Plaintiff's psychiatrist; and (vi) denied Plaintiff's appeal, UNC, ECU, the SOSW and its faculty including the members of the A&R Committee and the Review Panel regarded Plaintiff as having such impairments;

   d.   these adverse actions were taken because the SOSW faculty (i) wrongly believed that a person with such mental impairments could not meet the professional standards for practice as a social worker;

   e.   Plaintiff met the essential eligibility requirements for continuing in and completing the MSW Program and earning the MSW Degree, either with or without an accommodation; and

   f.   Plaintiff in fact completed those requirements and earned the MSW Degree, but ECU refused to award her the degree because it perceived Plaintiff as mentally disabled.

122. Defendants ECU and UNC discriminated against Plaintiff on the basis of her disability in that the SOSW:

   a.   imposed attendance and communications standards and requirements on her more stringent than those imposed on the other non- mentally disabled students in the MSW Program;

b. refused to excuse absences and delays that were or would have been routinely excused if Plaintiff did not have mental illness;

c. held against Plaintiff behaviors that were the manifestations of mental illness but which in no way actually rendered Plaintiff unable to meet the requirements for participation in the MSW Program or unfit to hold the MSW Degree;

d. terminated Plaintiff from the MSW Program;

e. refused to allow her to continue attending Dr. Carawan's seminar;

f. refused to provide her field instruction and supervision; and

g. refused to consider evidence of Plaintiff's condition and alleviation of symptoms through medication and treatment in reconsidering her termination or in determining her appeal;

h. Refused to consider Plaintiff's actual completition of the requirements for the MSW Degree, or the assessment of two Licensed Clinical Social Workers regarding Plaintiff's actual professional performance in determining her appeal.

123. Additionally, the Defendants' discriminatory motive is show by its treatment of other students who did not have mental illness.

124. For example, during the time Plaintiff was in the last year of the MSW Program, the SOSW asserted that another student in the program, who had had to be out of school for an extended period because of a medical problem, missed too much class and failed to complete assignments in SOSW 6550. The SOSW faculty called an A&R Meeting to address these

shortcomings, and on information and belief the A&R Committee directed this student's professor to give him an "incomplete" as his grade in SOSW 6550, and ECU refused to give him credit for that class and withheld the MSW Degree. The student complained to the ECU Office of Equity and Diversity, and on information and belief pointed out that other students' had been allowed to graduate in similar circumstances. The SOSW relented, graded the student's work, gave him credit for SOSW 6550, and awarded him the MSW Degree.

125. In addition, during the same time frame, on information and belief another student in the MSW Program missed significant time from school and class because of a substance abuse problem which was disabling and impacted professional conduct and communication with the faculty, but was not a mental illness. The student received treatment for substance abuse, and the SOSW excused the student's absenteeism. ECU awarded the student the MSW Degree.

126. Defendants' violations of the ADAAA resulted in Plaintiff suffering compensable economic damages resulting from the refusal of ECU to award Plaintiff the valuable MSW Degree, and the consequential denial of significant employment opportunities.

127. Plaintiff also suffered compensable non-economic damages in the form of humiliation, embarrassment and emotional distress from her being "kicked out" of the MSW Program, being prohibited from attending Dr. Carawan's class, and being denied the MSW Degree losing the benefit of several years of her work and study.

## CLAIM II:    DISABILITY DISCRIMINATION – 29 U.S.C. § 794

128. All prior allegations set forth above are hereby incorporated by reference.

129. The discriminatory treatment described herein, resulting in Plaintiff's termination from the MSW Program during her final term, also violated the Rehabilitation Act, 29 U.S.C. § 794.

130. On information and belief, UNC and ECU receive federal funds and thus are public entities subject to the requirements of the Rehabilitation Act.

131. The same actions complained of as discrimination in violation of Title II of the ADAAA are incorporated here by reference and also constitute discrimination under 29 U.S.C. § 794.

## CLAIM III:   BREACH OF CONTRACT

132. All prior allegations set forth above are hereby incorporated by reference.

133. Plaintiff and Defendant ECU entered into an agreement whereby in exchange for Plaintiff's payment of certain tuition and fees, the SOSW would provide her the instruction and training necessary to earn the MSW Degree and to become qualified to seek professional employment in the field of social work.

134. As part and parcel of the services and benefits promised Plaintiff in exchange for her payments, ECU, and separately the SOSW, promised to follow certain written rules and procedures in the event that it were to consider terminating her from the MSW Program for any reason, including without limitation academic or disciplinary reasons.

135. Among those rules and procedures were the appeal rules and procedures, which required that Plaintiff be allowed to continue attending Dr. Carawan's class, that Dr. Carawan grade her work, and that Plaintiff continue to receive the services of an ECU field instructor, pending disposition of her appeal.

136. As part and parcel of the services and benefits promised Plaintiff in exchange for her payments, ECU, and separately the SOSW, promised not to discriminate against the Plaintiff based on mental illness.

137. Plaintiff completed the requirements for and earned the MSW degree.

138. Defendants breached the contract with Plaintiff by forbidding her to attend Dr. Carawan's seminar, by directing or permitting Dr. Carawan not to grade Plaintiff's work, by directing or permitting Professor Pierson to refuse to serve as Plaintiff's ECU field instructor, and by failing to award Plaintiff the MSW Degree.

139. Defendant's breach of the contracted resulted in compensable economic damages including loss the value of the MSW Degree, and of income and employment opportunity.

WHEREFORE, Plaintiff prays unto the Court for the following relief:

1. That she have and recover from the Defendants jointly and Severally her compensable economic and non-economic damages cause by Defendants' violation of the ADAAA and the Rehabilitation Act.

2. That she have and recover from the Defendants jointly and severally her compensable economic damages arising from breach of contract.

3. That the costs of the action, including Plaintiff's reasonable attorneys' fees, be taxed to the Defendants jointly and severally.

4. That she have trial by jury on all issues so triable.

5. That she be granted and awarded such other and further relief as to the Court seems just and proper.

Respectfully submitted on this 14th day of March, 2017.


HAITHCOCK, BARFIELD, HULSE & KINSEY, PLLC


Glenn A. Barfield
State Bar No. 13770
Post Office Drawer 7
Goldsboro, North Carolina 27533-0007
Telephone.    (919) 735-6420
Facsimile.    (919) 734-6296
Email.    barfield@hbhklaw.com

STATE OF _California_

COUNTY OF _Orange_

I, OLIVIA NEAL being first duly sworn, deposes and says: That she is the _Plaintiff_ in the

foregoing action, that _she_ has read the foregoing Complaint and knows the contents thereof; that

the same is true and correct of _her_ own knowledge except those matters and things therein

alleged upon information and belief and as to those she believes the same to be true.

_____
OLIVIA NEAL

Sworn to and subscribed before me

This the ___13th___ day of March, 2017.

_____
     NOTARY PUBLIC

My commission expires: _____

See Attached Document ES

# CALIFORNIA JURAT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document, to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA }

COUNTY OF _Orange_ }

Subscribed and sworn to (or affirmed) before me on this __13th__ day of __March__, __2017__
                                                                            *Date*              *Month*              *Year*

by_____ Olivia  Neal _____

_____
                                          *Name of Signers*

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature: _Erik Sanchez_____
                    *Signature of Notary Public*

```
ERIK SANCHEZ
COMM...2170922
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
My Term Exp. November 6, 2020
```

*Seal*
*Place Notary Seal Above*

-------------------------------- OPTIONAL --------------------------------

*Though this section is optional, completing this information can deter alteration of the document or fraudulent attachment of this form to an unintended document.*

Description of Attached Document
Title or Type of Document:_____

Document Date:_____

Number of Pages:_____

Signer(s) Other Than Named Above:_____